PD-0064&0065&0066&0067-1
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/16/2015 11:15:34 PM
Accepted 3/18/2015 4:02:38 PM
ABEL ACOSTA
CLERK

# TO THE COURT OF CRIMINAL APPEALS OF TEXAS

## PD-0064-15, PD-0065-15, PD-0066-15, PD-0067-15

_____

**WYDELL DIXON,**
*Appellant*
v.
**THE STATE OF TEXAS,**
*Appellee*

_____

# PETITION FOR DISCRETIONARY REVIEW

_____

On Petition for Discretionary Review from the Court of Appeals for the First District, Houston, Texas in Cause Nos. 01-13-00408-CR; 01-13-00409-CR; 01-13-00410-CR & 01-13-00411-CR, Affirming the Conviction in Cause Nos. 12CR0748, 12CR0749, 12CR0750, & 12CR0751 from the 56th District Court of Galveston County, Texas.

_____

FILED IN
COURT OF CRIMINAL APPEALS

March 18, 2015

ABEL ACOSTA, CLERK

**R. Scott Shearer**
TBA No. 00786464
917 Franklin, Suite 320
Houston, Texas 77002
(713) 254-5629
(713) 224-2889 FAX
*ShearerLegal@Yahoo.com*

**Attorney for Appellant**

March 16, 2015

1

# SUBJECT INDEX

**Page**

List of Authorities.................................................................. iv

Names of All Parties............................................................. v

Statement Regarding Oral Argument........................................... vi

Statement of the Case............................................................ 2

Statement of the Procedural History of the Case........................... 3

Question for Review Number One............................................... 4

**QUESTION FOR REVIEW NUMBER ONE**: Appellant challenged the jurisdiction of the trial court through a motion to dismiss. Appellant argued that the State improperly alleged a felony by commission of elements defined as a misdemeanor based upon *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.). The panel held that the 2007 amendments to the animal cruelty statute overruled the Corpus Christi court's decision. Was this error?

(Op. at 11-14)

Reasons for Review................................................................ 4

Argument and Authorities....................................................... 11

Question for Review Number Two............................................. 14

**QUESTION FOR REVIEW NUMBER TWO**: Did the court of appeals err by holding that the State could charge Appellant under the felony provision of TEX. PENAL CODE §42.092 subsection (b)(1) based upon an incomplete definition of the predicate misdemeanor offense found in TEX. PENAL CODE §42.092 subsection (b)(3)?

(Op. at 20)

Reasons for Review............................................................................. 14

Argument and Authorities.................................................................. 14

Question for Review Number Three................................................. 18

**QUESTION FOR REVIEW NUMBER THREE**: Did the court of appeals err by holding that the evidence was sufficient to prove the mental state of recklessness?

(Op. at 18-19)

Reasons for Review............................................................................. 18

Argument and Authorities.................................................................. 18

Question for Review Number Four.................................................. 20

**QUESTION FOR REVIEW NUMBER FOUR:** Did the court of appeals err by finding harmless error where the trial court failed to grant an agreed mistrial and failed to grant a motion for new trial after previously sequestered jurors were not provided overnight facilities and were allowed to separate in violation of TEX. CRIM. PROC. CODE ANN. art. 35.23?

(Op. at 28-31)

Reasons for Review............................................................................. 20

Argument and Authorities.................................................................. 20

Prayer for Relief.................................................................................. 20

Certificate of Service.......................................................................... 21

APPENDIX -      Copy of the opinion rendered by the court of appeals… 22

# LIST OF AUTHORITIES

**Page**

**CASES**

*King v. State*, 953 S.W.2d 266 (Tex. Cr. App. 1997) ...............................................22

*State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.)

 .............................................................................................. …ii, 4, 12, 13, 14

**STATUTES**

TEX. CRIM. PROC. CODE ANN. art. 29.03 .................................................. 4, 14, 15, 18

TEX. CRIM. PROC. CODE ANN. art. 29.13 .................................................. 4, 14, 15, 18

TEX. PENAL CODE §6.03…………………………………………………………16

TEX. PENAL CODE art 42.092 ......................................................................... ii, 12, 14

TEX. PENAL CODE art. 42.092(b)(3) ......................................................................15

**RULES**

TEX. R. APP. PROC. 38.1(a)....................................................................................v

## NAMES OF ALL PARTIES

In accordance with TEX. R. APP. PROC. 38.1(a), Appellant submits that the following are interested parties:

**R. Scott Shearer -**            Attorney for Appellant.

917 Franklin, Suite 320
Houston, TX 77002

**Wydell Dixon** -                Appellant.

69 Borondo Pines
La Marque, TX 77568

**Elizabeth Cuchens** -           Trial counsel for the State of Texas.
**Brent Haynes**

District Attorney's Office
600 59th Street, Ste. 1001
Galveston, TX 77551

**Rebecca Klaren**-               Appellate counsel for the State of Texas.

District Attorney's Office
600 59th Street, Ste. 1001
Galveston, TX 77551

**Hon. Lonnie Cox** -             Presiding judge of the Trial Court.

600 59th Street, Suite 3302
Galveston, TX 77551

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes oral argument will be helpful. Appellant requests oral argument.

# TO THE COURT OF CRIMINAL APPEALS OF TEXAS

## PD-0064-15, PD-0065-15, PD-0066-15, PD-0067-15

_____

**WYDELL DIXON,**
*Appellant*
v.
**THE STATE OF TEXAS,**
*Appellee*

_____

# PETITION FOR DISCRETIONARY REVIEW

_____

On Petition for Discretionary Review from the Court of Appeals for the First District, Houston, Texas in Cause Nos. 01-13-00408-CR; 01-13-00409-CR; 01-13-00410-CR & 01-13-00411-CR, Affirming the Conviction in Cause Nos. 12CR0748, 12CR0749, 12CR0750, & 12CR0751 from the 56th District Court of Galveston County, Texas.

_____

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

**APPELLANT, WYDELL DIXON,** by and through his counsel on appeal, files this Petition for Discretionary Review. In support of his request for review, Appellant would respectfully show the Court the following:

7

## STATEMENT OF THE CASE

This appeal lies from Appellant's conviction in *State of Texas v. Wydell Dixon*, Cause Nos. 12CR0748, 12CR0749, 12CR0750, 12CR0751 in the 56th District Court of Galveston County, Texas. Appellant was charged with the offense of cruelty to non-livestock animals. See TEX. PENAL CODE §42.092. (CR at 7). Appellant proceeded to a jury trial (RR III at 32) and was found guilty. (RR VIII at 23). On February 14, 2013, the Court assessed punishment at 2 years in the state jail, probated for a period of five [5] years on each case, to be served concurrently. (CR at 284). The Appellant filed a motion for new trial, which was overruled after a hearing. (CR at 302). The Appellant perfected her appeal when she filed a timely notice on March 1, 2013. (CR at 293).

_____

\*      The record on petition for discretionary review
        is cited as follows:

CR at *p*          ..........Clerk's record at page *p*.

RR *V* at *p*      ..........Reporter's record volume *V* at page *p*.

Op. at *p*         ..........Opinion at page *p*.

**STATEMENT OF THE PROCEDURAL HISTORY OF THE CASE**

In a PUBLISHED opinion delivered December 16, 2014, a panel of the First Court of Appeals AFFIRMED Appellant's conviction for cruelty to non-livestock animals. The Appellant did not file a motion for rehearing. The Appellant's Petition for Discretionary Review was due on January 15, 2015. Appellant filed a Motion for Extension of Time to File Petition for Discretionary Review, which was granted. Appellant's Petition for Discretionary Review was due February 16, 2015. Due to the necessity of counsel having surgery for a MSRA infection, Appellant filed a second Motion for Extension of Time to File Petition for Discretionary Review, which was granted. Appellant's Petition for Discretionary Review is due March 16, 2015.

# GROUNDS FOR REVIEW

**QUESTION FOR REVIEW NUMBER ONE**: Appellant challenged the jurisdiction of the trial court through a motion to dismiss. Appellant argued that the State improperly alleged a felony by commission of elements defined as a misdemeanor based upon *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.). The panel held that the 2007 amendments to the animal cruelty statute overruled the Corpus Christi court's decision. Was this error?

(Op. at 11-14)

**Reasons for Review:**

1. The panel decision of the First Court of Appeals requires review because the court decided an important question of state law that that is in conflict with another decision of a Court of Appeals on the same matter. The panel decision is in conflict with the Corpus Christi court's decision in *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.).

2. The panel decision of the First Court of Appeals requires review because the court has misconstrued TEX. PENAL CODE § 42.092.

3. The panel decision of the Court of Appeals requires review because the court of appeals has decided an important question of state law, which has not been, but should be settled by this Court.

**Statement of facts:**

Appellant, Wydell Dixon, is the owner of a non-profit cat sanctuary located at 1112 6th Street in Texas City, Texas. (RR IV at 165). The sanctuary, known as "Whiskerville," has been in operation since approximately 2003. (RR IV at 71). At a cat sanctuary, as opposed to a shelter, the cats are not euthanized or killed. (RR IV at 21-22). The cats at Whiskerville are "free range" and are not kept in cages. A free range environment is more comfortable to, and less stressful upon, the cats. (RR VI at 93). It is also easier to maintain than a facility with cages. (RR VI at 109).

Mrs. Dixon purchased the property where the shelter is located with approximately one-hundred-fifty thousand dollars [$150,000.00] of her own money (RR V at 122)(RR VI at 195) and paid 95% of the operating costs of the shelter with her own funds. The Appellant had a passion for saving animals (RR VI at 179) and the creation of Whiskerville was the Appellant's dream. (RR VI at 180). Mrs. Dixon was particular about things that needed to be done to keep Whiskerville sanitary and clean. (RR V at 143) and she was very meticulous when it came to caring for the cats. (RR IV at 84 (RR VI at 189).

Mrs. Dixon had a business relationship with a local veterinarian, Dr. John Shelby. (RR VI at 87). According to Dr. Shelby, Mrs. Dixon did well beyond

11

what most animal owners could ever possibly do to care for cats. (RR VI at 95). Mrs. Dixon brought Dr. Shelby many animals that he treated and Mrs. Dixon did not specify a monetary limit when it came to their treatment. (RR VI at 95). In 2004, Mrs. Dixon and Whiskerville received an award from the local paper for making Galveston a better place to live. (RR VI at 173).

On October 18, 2011, Whiskerville underwent a State required inspection by a licensed veterinarian. Whiskerville passed the inspection with a 'satisfactory' grade (the highest category) and a regional veterinary supervisor approved the inspection on November 7, 2011. (RR IV at 125). The inspector found Whiskerville to be "very clean" and to possess adequate food and water. (RR VI at 70).

Mrs. Dixon had one paid employee at the Whiskerville shelter, whose name is Kimberly Jane Paskert. Ms. Paskert was a loyal and valuable employee who could always be depended upon to show up for work. (RR VI at 125). Ms. Paskert worked at Whiskerville for approximately six [6] years before this incident. She worked there from August, 2005 to January 3, 2012, except for a one year absence. (RR V at 169). The Appellant treated Ms. Paskert like family. (RR VI at 188). The Appellant paid Ms. Paskert an agreed upon wage (RR VI at 161) gave her a car loan (RR VI at 152) paid for her gas (RR VI at 43, 118) and also paid for her cell phone. (RR VI at 118). The Appellant also paid Ms. Paskert extra money

12

when she did extra jobs. (RR VI at 119). Ms. Paskert enjoyed working at Whiskerville (RR VI at 118) and thought it was a wonderful place for cats. (RR VI at 26, 32, 122). It was her job to feed, water, and cleanup after the cats. (RR VI at 187). She was the sole custodian of the cats. (RR VI at 121). Food, water, and medicine were always available for the cats. (RR VI at 137-138). Ms. Paskert found the work to be satisfying. (RR VI at 117). None one watched over her shoulder (RR VI at 122) and Ms. Paskert was confident that she could maintain the Whiskerville facility without the help of Mrs. Dixon. (RR VI at 137). Mrs. Dixon lived just a short distance away from Whiskerville (RR VI at 137) and Ms. Paskert was confident that Mrs. Dixon would be there if she needed something. (RR VI at 137). Mrs. Dixon was there for her whenever Ms. Paskert needed her. (RR VI at 119, 159). Ms. Paskert had a flexible schedule (RR VI at 122) and also worked at an unrelated job cleaning houses. (RR VI at 132). Ms. Paskert was the custodian of the cats before the seizure (RR VI at 121) and she claimed sole responsibility for the care and feeding of the cats and the cleanliness of the Whiskerville facility. (RR VI at 121, 140). The system worked out between Mrs. Dixon and her employee Ms. Paskert worked well for years (RR VI at 124-125) - that is until January 3, 2012.

At the end of November, 2011, Mrs. Dixon took off work to reconnect with her family and to deal with some other family issues during the holidays. (RR VI

at 196).   Mrs. Dixon left Ms. Paskert in charge of the care and feeding of the cats. Mrs. Paskert claims that she was approached by a volunteer named Karen Tibbits in August or September of 2011.  (RR VI at 47).  Ms. Tibbits would help Ms. Paskert at Whiskerville a few times a week.  (RR VI at 47).  After Christmas, 2012, Ms. Paskert said she asked Ms. Tibbits if she would be willing to work for a week while Ms. Paskert took off from work.  (RR VI at 48).  Ms. Paskert did not tell Mrs. Dixon about her decision to ask Ms. Tibbits to fill in for her.  (RR VI at 49, 65, 139).  Mrs. Dixon had no knowledge of the Tibbits arrangement.  (RR VI at 139).  In fact, it was Mrs. Dixon's policy not to allow 3rd parties to be in charge of Whiskerville.  (RR VI at 139, 188-189).   The last time Ms. Paskert was at Whiskerville was on December 26, 2012.  (RR VI at 139).  Ms. Paskert did not go to Whiskerville at all the week after Christmas, 2012.  (RR VI at 50).  Ms. Paskert believed she transferred custody of the Whiskerville cats to Karen Tibbits.  (RR VI at 139).  The next time Ms. Paskert came to Whiskerville was the morning of the seizure.  (RR VI at 49, 58).

During Wydell Dixon's absence from the shelter, Mrs. Dixon kept in contact with Ms. Paskert via text message and telephone.  Mrs. Dixon texted Ms. Paskert and asked her how the kitties were.  (RR VI at 142-143).  Mrs. Paskert told Mrs. Dixon the kitties were fine.  (RR VI at 142, 153).  Ms. Paskert gave Mrs. Dixon the impression that things were okay at Whiskerville.  (RR VII at 150).  Ms. Paskert

14

lied to Mrs. Dixon. (RR VI at 51, 65, 141). During her absence from Whiskerville, Ms. Paskert came to Mrs. Dixon's house to drop off Whiskerville laundry. (RR VI at 153). While she was there, Mrs. Dixon asked her in person how the cats were. (RR VI at 50, 153). Ms. Paskert lied to her again and told her the cats were okay. (RR VI at 50, 153). Ms. Paskert never told Mrs. Dixon that she was not working at Whiskerville. (RR VI at 50). Mrs. Dixon had no knowledge of Ms. Paskert taking off for a week. (RR VI at 50, 139). The supervising officer on the case could find no evidence to dispute the Appellant's lack of knowledge. (RR V at 12).

On January 3, 2012, Galveston County Animal Control received information from a neighbor who lived near Whiskerville. (RR IV at 23). The neighbor informed Galveston County Animal Control that she had not seen any activity at the Whiskerville premises for some time and suspected that the cats were not being taken care of. (RR V at 154). Kim Schoolcraft, the animal services manager of the Galveston County Health District, received the information about the complaint at Whiskerville. (RR IV at 17, 23). Mrs. Schoolcraft had Mrs. Dixon's telephone number but did not call her on the day she received the complaint. (RR IV at 26, 93, 103). Mrs. Schoolcraft received the call concerning Whiskerville at around 4 or 5 p.m. on January 2, 2012. (RR IV at 95). Instead of contacting Mrs. Dixon, Mrs. Schoolcraft waited until the next day, January 3, 2012, when she called the

15

Texas City Police Department and arranged for them to begin an investigation. (RR IV at 26). After notifying the police, Mrs. Schoolcraft travelled to Whiskerville herself in order to judge how many animals she would have to prepare to receive at the Galveston County Animal Resource Center. (RR IV at 26-27). In response to the citizen inquiry, an animal control officer went to the Whiskerville location and observed cats to be in distress through a window. (RR IV at 135, 137). The officer then obtained a civil seizure warrant to enter the premises and seize the animals. He also obtained a consent to search from Mrs. Dixon. (RR IV at 32, 140-141, 173). State actors, in the form of Galveston County Animal Control officers and others, removed 168 live cats from the Whiskerville sanctuary as well as 27 deceased cats. (RR IV at 53). There was a lot of media at the scene. (RR IV at 149). There were police cars, animal vehicles, and newspaper companies present, and there was a helicopter flying overhead. (RR V at 156).

The conditions inside of the sanctuary were disturbing. There were feces and urine on the floors and walls. (RR IV at 42). The living cats were in bad condition (RR IV at 44) and there were dead cats in various places. (RR IV at 47-48). Each of the rooms at Whiskerville had a litter box, water dispensers, and food bowls. (RR IV at 91). The cats did not have access to the food and water, however. There were adequate supplies of food, water, and medicine at

16

Whiskerville; the problem was there had been no person there to distribute them to the animals. (RR IV at 88, 102-103)(RR V at 68). The conditions at Whiskerville deteriorated over the course of one week. (RR VI at 62). This time frame was consistent with the testimony of a veterinarian. (RR V at 78).

Both Wydell Dixon and Kimberly Paskert arrived at Whiskerville during the process of the cat seizures. (RR IV at 142-143). Ms. Paskert was interviewed on television and indicated that she wanted to kill herself for her failure to take care of the cats. (RR VI at 155). Ms. Paskert took full responsibility for what occurred at Whiskerville. (RR VI at 146).

Ms. Paskert received immunity from the State to testify at Appellant's trial. (CR at 248-249). Ms. Paskert pleaded guilty to a misdemeanor animal cruelty charge. Appellant was never offered a misdemeanor plea. (RR III at 4). The State obtained a civil judgment against Appellant for approximately $250,000.00. (RR IV at 101).

**Argument and Authorities:**

In its opinion of December 16, 2015, Appellant submits the panel fell into error when it held that the legislature's 2007 amendments to the animal cruelty

statute overruled the Corpus Christi court's decision in *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.).

Appellant was indicted for allegedly committing felony cruelty to animals under TEX. PENAL CODE §42.092. According to the plain text of the indictments, the State alleged the Appellant caused serious bodily injury to animals under the felony provision of TEX. PENAL CODE §42.092 subsection (b)(1) by failing unreasonably to provide necessary food, water, care, or shelter under the misdemeanor provisions of TEX. PENAL CODE §42.092 subsection (b)(3). This they cannot do. The State may not allege a misdemeanor cruelty charge under the guise of a felony. *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.). The felony and misdemeanor provisions of TEX. PENAL CODE §42.092 are separate and distinct provisions with no relation existing between the two. *Id*. at 206. A person can commit the misdemeanor offense of failing unreasonably to provide necessary food, water, care, or shelter or a person may commit the felony offense of torturing, killing, or causing serious bodily injury to an animal – but a person cannot commit a felony offense by committing predicate acts that are listed as a misdemeanor under the statute. *Id*. at 207. Were this not true, the distinctions in punishment set forth by the legislature would be rendered meaningless. The misdemeanor conduct proscribed by the statute would be subsumed by the felony

18

provision.  See *State v. Kingsbury*, 129 S.W.3d 202, 207 (Tex. App. – Corpus Christi 2004, no pet.).

The trial court in *Kingsbury* granted defendant Kingsbury's motion to dismiss and the Corpus Christi court of appeals affirmed.  The court of appeals held that the district court lacked jurisdiction because the indictment did not sufficiently allege a felony.  *State v. Kingsbury*, 129 S.W.3d 202, 207 (Tex. App. – Corpus Christi 2004, no pet.).

The *Kingsbury* case, like the present one, dealt with animals that had perished.  The language of the indictment contained in *Kingsbury* is virtually identical to the language contained in the indictments in the present case.  The only real differences being the Legislature's addition of cruelly killing and causing serious bodily injury to the former section defining felony "torture" under the old statute and the fact that Kingsbury was charged before the statute was split into separate offenses covering livestock and non-livestock.

Appellant contends that her indictments suffer from the same infirmity as the Corpus Christi court struck down in *Kingsbury*.  The legislature's addition of the cruelly killing and causing serious bodily injury provisions to the former section defining felony "torture" under the old statute do not change the analysis.  The court of appeals erred by holding otherwise.

**QUESTION FOR REVIEW NUMBER TWO**: Did the court of appeals err by holding that the State could charge Appellant under the felony provision of TEX. PENAL CODE §42.092 subsection (b)(1) based upon an incomplete definition of the predicate misdemeanor offense found in TEX. PENAL CODE §42.092 subsection (b)(3)?

(Op. at 20)

**Reasons for Review:**

1.      The panel decision of the First Court of Appeals requires review because the court decided an important question of state law that that is in conflict with another decision of a Court of Appeals on the same matter.  The panel decision of the First Court of Appeals is in conflict with the Corpus Christi court of appeals decision in *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. – Corpus Christi 2004, no pet.).

2.      The panel decision of the Fourteenth Court of Appeals requires review because the court has misconstrued TEX. PENAL CODE § 42.092.

3.      The panel decision of the Court of Appeals requires review because the court of appeals has decided an important question of state law, which has not been, but should be settled by this Court.

**Argument and Authorities:**

The panel erred by holding that the State could charge Appellant under the felony provision of the animal cruelty statute by using only a portion of the misdemeanor offense proscribed in TEX. PENAL CODE §42.092(b)(3).  Assuming

20

for the sake of argument that it was permissible for the State to use the misdemeanor offense conduct as predicate acts to allege a felony, it was still necessary for the State to incorporate the entire misdemeanor definition of prohibited conduct and not merely just a portion. The State conveniently forgot to include the issues of reasonableness and custody as defined by TEX. PENAL CODE §42.092(b)(3). TEXAS PENAL CODE Section 42.092(b)(3) proscribes an offense when a person "fails **unreasonably** to provide necessary food, water, care, or shelter for an animal **in the person's custody**." TEX. PENAL CODE §42.092(b)(3)(emphasis added).

Simply stated, the State could not cherry pick only those portions of the misdemeanor offense they liked without also incorporating the remainder of the definition, which includes the defensive issues of custody and reasonableness. The court of appeals found that the State assumed a higher burden by proving the misdemeanor acts plus the addition of death or serious bodily injury. (Op. at 13). In fact, just the opposite is true. The misdemeanor offense as written by the legislature requires custody. The court of appeals has authorized Appellant's conviction of a felony by incorporating as a predicate act only a partial and incomplete definition of the proscribed misdemeanor offense. Failure to provide food, water, or care to an animal is not what is prohibited by subsection (b)(3) of the animal cruelty statute. Only when such failure is visited upon an animal in that

21

person's custody does the statute result in a criminal offense. Were this not so, every person in the State would be criminally responsible for every unfed or unwatered animal though they are unaware of that animal's location and existence.

The panel's interpretation leads to absurd results and creates a strict liability offense. A non-pet owner in Houston, for instance, could be charged with failing to feed and water a horse in El Paso. Once the State proved that an animal was harmed because it did not receive food, water, or care, the requisite mental state with regard to the nature of conduct would be self-proved and the defendant would be held liable regardless of duty of care, reasonableness, or custody. See TEX. PENAL CODE §6.03.

Appellant filed a motion to quash and objected to the indictment's failure to include the element of custody. (RR III at 16-18). Appellant also objected to the failure of the charge to include the definitions of custody, reasonableness, and the defense of transference of custody. (CR at 256) (RR VII at 13-14). Appellant's requested charges were denied and her objections overruled. (RR VII at 14-15).

The trial court's failure to require the State to prove the element of custody resulted in her unjust conviction. She was deprived of a complete defense to the misdemeanor conduct, which was a predicate to the felony conduct allegations. Plainly, the cats were not in the Appellant's custody. The State's whole theory was that Appellant was negligent in allowing them to be in the custody of someone

22

else.    The evidence in this case is uncontroverted that Appellant transferred custody of the cats to Ms. Paskert.  Ms. Paskert, a witness for the State, admitted that she was the sole custodian.  (RR VI at 121).  The court of appeals erred by not finding the trial court's actions to be error.

**QUESTION FOR REVIEW NUMBER THREE**: Did the court of appeals err by holding that the evidence was sufficient to prove the mental state of recklessness?

(Op. at 18-19)

**Reasons for Review:**

1.      The panel decision of the Court of Appeals requires review because the court of appeals has decided an important question of state law, which has not been, but should be settled by this Court.

2.      The panel decision of the Fourteenth Court of Appeals requires review because the court has misconstrued a state statute.  The court misconstrued TEX. PENAL CODE § 42.092 and TEX. PENAL CODE § 6.03.

**Argument and Authorities:**

It is undisputed that Appellant did not personally fail to provide necessary food, water, or care for the cats at Whiskerville.  Additionally, no witness ever testified that the Appellant violated any rule, ordinance, law, or regulation governing the question of how many employees per cat are required when working at an animal shelter.  (RR IV at 86)(RR V at 22-23).  Because there is no such standard, Appellant could not possibly have been aware of, but consciously

24

disregarded, a substantial and unjustifiable risk that the circumstances existed or the result would occur.

Appellant's conduct did not constitute a gross deviation from the standard of care that an ordinary person would exercise. An ordinary person would assume, given the past performance of Ms. Paskert over a period of six years, that she would continue to do her job or provide some form of notice that she intended to take off from work. The objective standard of recklessness is viewed through the eyes of the ordinary person standing in Appellant's shoes. A rational fact-finder could not have found, beyond a reasonable doubt, that Appellant was aware of the risk that Ms. Paskert would suddenly and without warning fail to show up to work *after reliably having done so for six [6] years*.

This erroneous jury verdict mandates that an employer is now responsible for foreseeing that a long time trusted employee will suddenly decide not show up to work and then lie to them about this fact. An ordinary employer would not assume that a trusted and reliable employee of six years would suddenly act in such a way. Moreover, the risk that an employee will not show up to work is an ordinary risk, not the type of risk that is substantial and unjustifiable. The mental state of recklessness was not established by the evidence.

**QUESTION FOR REVIEW NUMBER FOUR:** Did the court of appeals err by finding harmless error where the trial court failed to grant an agreed mistrial and failed to grant a motion for new trial after previously sequestered jurors were not provided overnight facilities and were allowed to separate in violation of TEX. CRIM. PROC. CODE ANN. art. 35.23?

(Op. at 28-31)

**Reasons for Review:**

1.      The panel decision of the First Court of Appeals requires review because the court decided an important question of state law that that is in conflict with a decision of this Court.  The panel decision is in conflict with this Court's decision in *King v. State*, 953 S.W.2d 266, 271 (Tex. Cr. App. 1997).

2.      The panel decision of the First Court of Appeals requires review because the court has misconstrued TEX. CRIM. PROC. CODE ANN. art. 35.23.

3.      The panel decision of the Court of Appeals requires review because the court of appeals has decided an important question of state law, which has not been, but should be settled by this Court.

**Argument and Authorities:**

Appellant moved to sequester the jury.  (RR VII at 60).  Appellant's motion was granted by the trial court.  (RR VII at 60).  According to the testimony of one of the bailiffs who accompanied the jurors, the jurors were placed at a hotel room at approximately 11 p.m. on December 19th.  (RR VIII at 11).  Thereafter, at

26

approximately 10 minutes before 2 a.m., a bomb threat was phoned into their hotel and the jurors were evacuated. (RR VIII at 8-9). During the evacuation the jurors were separated and intermixed with non-jurors. The jurors overheard discussions carried on by other persons at the evacuated hotel. (RR VIII at 13-14). The Jury was made aware that there was a bomb threat to the hotel from other guests at the hotel. (RR VIII at 13-14).

Unfortunately, another hotel was unable to accommodate the jury and the jurors themselves requested to be taken back to the courthouse because they felt it would be safer. (RR VIII at 10). The jurors remained there in the jury room the entire night without sleep. (RR VIII at 10). No separate facilities were provided for male and female jurors. The bailiff testified that she was not able to provide facilities to the jurors because of the lack of hotel accommodations. (RR VIII at 12).

Upon learning of the bomb threat and the circumstances of the previous night, and before the jury rendered its verdict, Appellant moved for a mistrial. (RR VIII at 18-19). The State agreed to the mistrial. (RR VIII at 20-21). Nevertheless, the trial court denied Appellant's motion. (RR VIII at 21).

Appellant broached the subject again when she filed her motion for new trial. (CR at 302). A hearing was held on Appellant's motion for new trial, but the

State called no witnesses. (RR X at 30, 32). Undersigned counsel testified that Appellant did not consent to the separation. (RR X at 8).

The mandatory provisions of article 35.23 were violated. The jurors were allowed to separate and they were not provided overnight facilities. During the evacuation of the hotel, the jurors were forced to mingle with other non-juror guests of the hotel. During this separation, the jurors learned they were the subject of a potential bombing. The jurors would undoubtedly have (wrongly) attributed the bomb threat to the Appellant. The jurors actually expressed their fears to the bailiff and were so concerned for their safety that they preferred returning to the courthouse rather than staying at another hotel. As a consequence, the jurors in the present case rendered their verdict in an environment of hostility, fear, and exhaustion. This undoubtedly led to the jury reaching a verdict of guilt that would not have been rendered under normal circumstances. Any rational juror holding doubts about the Appellant's guilt would have simply abandoned their previous position so as to render a quick verdict and escape the situation.

The jury deliberated from the morning of Friday, January 18th until they were released that evening. (CR at 15). The jury was instructed to return for deliberations on Saturday, January 19th. (RR VII at 62). The jury resumed deliberations until noon, then came back with a verdict just a few hours after spending all night in the jury room of the court house. (CR at 15). As a result, this

28

jury reached a verdict that was the product of coercion, rather than by thoughtful consideration of the evidence.

Appellant has shown harm. Appellant had a right to an impartial jury unaffected by threats, fear, coercion, exhaustion, and outside influence. The trial court's inability to comply with the mandatory provisions of Article 35.23 had a substantial and injurious effect and influence on the jury's verdict. See *King v. State*, 953 S.W.2d 266, 271 (Tex. Cr. App. 1997). The court of appeals erred by finding the error harmless.

## PRAYER FOR RELIEF

FOR THESE REASONS, Appellant respectfully asks this Court to grant review of the decision of the court of appeals. Appellant further prays that this Court will reverse the judgment of the court of appeals.

Respectfully submitted,

By: /s/ R. SCOTT SHEARER
**R. Scott Shearer**
TBA No. 00786464
917 Franklin, Suite 320
Houston, Texas 77002
(713) 254-5629
(713) 224-2889 FAX
*ShearerLegal@Yahoo.com*

**Attorney for Appellant**

March 16, 2015

**CERTIFICATE OF SERVICE**

I certify that a copy of this Petition for Discretionary Review has been served upon the State of Texas by e-mailing a copy of same to the following parties at their respective addresses on this the 16th day of March, 2015:

A.D.A. ELIZABETH CUCHENS
DISTRICT ATTORNEY'S OFFICE
600 59TH STREET, STE. 1001
GALVESTON, TX 77551
*ELIZABETH.CUCHENS@CO.GALVESTON.TX.US*

LISA C. MCMINN
STATE PROSECUTING ATTORNEY
209 W. 14TH STREET
AUSTIN, TEXAS 78701

/s/ R. SCOTT SHEARER
**R. Scott Shearer**

# CERTIFICATE OF COMPLIANCE WITH RULE 9.4(i)(3)

Certificate of Compliance with Type-Volume Limitations
and Typeface Requirements.

1.  This Petition for Discretionary Review complies with the type-volume limitation of TEX. R. APP. PROC. 9.4(i)(2)(D) and (3) because:

    This Petition for Discretionary Review contains **4,489** words, excluding the parts of the Petition for Discretionary Review exempted by TEX. R. APP. PROC. 9.4(i)(1).

2.  This Petition for Discretionary Review complies with the typeface requirements of TEX. R. APP. PROC. 9.4(e) because:

    this Petition for Discretionary Review has been prepared in a conventional proportionally spaced typeface using Microsoft WORD 97 version 7.0 in Times New Roman 14 point type.

/s/R. SCOTT SHEARER
**R. Scott Shearer**

APPENDIX



In The

# Court of Appeals

For The

# First District of Texas

_____

**NOS. 01-13-00408-CR**
**01-13-00409-CR**
**01-13-00410-CR**
**01-13-00411-CR**

_____

**WYDELL DIXON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 12-CR-0748, 12-CR-0749, 12-CR-0750, 12-CR-0751**

---

**O P I N I O N**

A jury convicted appellant, Wydell Dixon, of four charges of cruelty to

nonlivestock animals, a state jail felony. *See* TEX. PENAL CODE ANN. § 42.092(b)(1),

(c) (Vernon 2011). The trial court then assessed punishment at two years' confinement, but suspended, and placed appellant under community supervision for five years' on each charge, to be served concurrently. On appeal, appellant contends (1) the evidence, when measured under a hypothetically correct jury charge, was legally insufficient; the trial court erred by (2) overruling appellant's motion to dismiss because the indictments charged a misdemeanor, not a felony; (3) permitting the State to charge strict liability offenses; (4) denying appellant's motion to quash based on the doctrine of *in pari materia*; (5) failing to submit appellant's requested defensive charges; (6) permitting behavior by the State that deprived appellant of due process and due course of law; and (7) failing to grant a mistrial and denying appellant's motion for new trial after jurors were not provided overnight facilities and were allowed to separate. We affirm.

## BACKGROUND

Appellant, Wydell Dixon, was the owner of a non-profit cat sanctuary located at 1112 6th Street in Texas City, Texas. The sanctuary, known as "Whiskerville," had been in operation since approximately 2003. At a cat sanctuary, as opposed to a shelter, the cats are not euthanized or killed. The cats are free to live there until they pass from old age. The cats at Whiskerville were "free range" and were not kept in cages. The majority of the Whiskerville cats were older cats and, therefore, not adoptable.

2

At the time of the offense, Whiskerville had only one employee, Kimberly Paskert. Paskert started working at Whiskerville in 2005, but left for a year in October or November of 2009, when she and appellant had a dispute over Paskert's work. Paskert was paid $30 per day when she started, and she was sometimes allowed to use a gas card for extra work.

Paskert returned to Whiskerville in October 2010 and worked there until December 2011. She worked five days per week until a part-time employee left in early February 2011. From the end of January or beginning of February 2011, until December 26, 2011, Paskert worked seven days per week. Paskert took off only three days in 11 months—one day each in October, November, and December 2011.

As the sole employee caring for nearly 200 cats, Paskert's work at Whiskerville was, as described by another former employee, "back breaking." Paskert's daily tasks included: cleaning the messes the cats made on the floors and counters; emptying four big litter pans, then scraping and cleaning the litter pans with sponges and sanitizer; refilling the litter pans; sweeping and cleaning the locations for the litter pans and putting the pans back; carrying 40 pound bags of litter from the garage into the main building, two to three times per day; cleaning inside the two feeders, if necessary, and refilling them; carrying 25 pound bags of food from the garage into the main building, at least twice per day; refilling the cat

3

food bins inside the main building, usually twice per day; cleaning the outside, the bottom, and, if necessary, the inside, of the 2.7 and 5 gallon water containers and then refilling them; and cleaning the bed, rug, litter pan, food container, and water container in as many as five cages.

Paskert had to do all this for the main area, the hallway, each of the six rooms in the main building, and the back building. Paskert had to clean furniture and take the trash out of every room. It took seven trips per day just to carry the used cat litter to the dumpster. Paskert's weekly tasks included: taking apart and cleaning the feeders; brushing the laundry, rugs, and towels, before taking them to Dixon to be washed at least three times per week; mopping once or twice per week; and cleaning all the windows. Paskert also had additional tasks to perform as needed: administering medicines and special foods to sick cats, sometimes feeding them with a syringe; cleaning the cat trees, which were as high as seven feet; soaking and rinsing the cat toys; clipping the cats' claws, so they would not grow into their paws; and checking the cats' ears for mites.

It took Paskert 10 to 15 hours per day, depending on messes, to do all of the daily chores, when she was able to finish them. Paskert always tried her hardest, but she "couldn't keep up with it all." She tried to do all she possibly could two to three days per week. Some days she worked six to eight hours; the minimum was three to five hours.

On January 3, 2012, animal control officers and peace officers responded to a complaint about Whiskerville. Kim Schoolcraft, the Animal Services Manager for the Galveston County Health District, looked through the windows. She saw dead animals, feces and urine on the floor and walls, and large feeders and water containers that were empty and dumped over. A lot of live cats were roaming freely. The cats had their mouths open, a sign of distress. There was a very strong odor, "[e]ven outside the building." Schoolcraft and the others waited until Texas City Police Department officers arrived to assess the situation and then obtain a civil animal seizure warrant.

Corporal Grandstaff, the Animal Control Supervisor of the Texas City Police Department, arrived. When Grandstaff looked through the windows, he saw dead cats. He also saw live cats clawing at the window and "screaming," "like they wanted to get out." Grandstaff testified there was "filth everywhere," feces all over, and water bowls overturned. He saw cats in cages without water bowls or food, and he smelled a stench.

Eventually, officers obtained a civil animal seizure warrant to rescue the cats in distress. When officers forced open a door, the stench was overwhelming. One animal control officer entered but had to exit, and vomited. Schoolcraft and Grandstaff entered, but had to back out because the odor was overwhelming. The

5

air inside Whiskerville was so bad officers had to obtain respirators for people to go inside and rescue the cats.

Once equipped with a respirator, Schoolcraft entered and saw several dead cats. Feces and urine covered the floor, the walls, and even the windows—"just about every surface." Live cats were running everywhere, terrified. There was no water available to the cats when officers entered the building. When officers poured water into bowls the cats fought and climbed over each other, "yowling, desperate for the water."

Schoolcraft testified that every cat was matted with urine and feces. This is unusual because cats are clean animals and it means the cats had given up trying to clean themselves. Many of the cats were emaciated, but some were very obese. There was evidence that some cats had cannibalized dead cats. Schoolcraft concluded that some of the cats had taken over the sources of food and water and not allowed the other cats near them.

Schoolcraft testified almost all of the cats had "upper respiratory infection, mouth ulcers, parasites, ear mites, ringworms, all types of problems." Many had green discharge from their nose and eyes. Some of the cats had open wounds. None of the cats were healthy.

Schoolcraft said there were five cages with cats inside that had no food or water. The rest of the cats were roaming freely, though some were in rooms with

6

the doors shut. There was at least one dead cat in each room. Twenty-seven dead cats and 168 live cats—a total of 195 cats—were removed from Whiskerville.

Both appellant and Paskert arrived at Whiskerville during the process of the cat seizures. Upon arrival, appellant asked about what was going on. When informed about the conditions inside Whiskerville, appellant became very upset and said, "I don't know why I pay her." Paskert was interviewed on television and indicated that she wanted to kill herself for her failure to take care of the cats.

During a subsequent interview with police, Paskert claimed that she had arranged to have a volunteer named Karen Tibbets take care of the cats so that she, Paskert, could take a week off after Christmas. Paskert said that she thought Tibbets was taking care of the cats. Paskert also said that she did not tell appellant about subcontracting her work to Tibbets, and that twice she told appellant that the "kitties were fine." Police were unable to locate anyone in the area named Karen Tibbets and concluded that no such person existed.

Appellant and Paskert were both arrested and charged with cruelty to nonlivestock animals. Paskert testified at appellant's trial under an offer of use immunity. She was not offered a plea deal in her own case.

After the case was submitted to the jury, appellant moved to sequester the jurors, and the trial court granted her motion. The jurors were taken to a local hotel at approximately 11 p.m. after the first day of deliberations. Approximately

7

four hours later, a bomb threat was phoned in to their hotel. The bailiffs evacuated the jurors, who were kept together, but who overheard third parties talking about the bomb threat. After the bailiffs were unable to find other accommodations for the jurors, they returned the jurors to the deliberation room at the courthouse, where the jurors slept on the floor the rest of the night. After continuing their deliberations the next morning, the jury returned guilty verdicts on four counts of animal cruelty.

## INDICTMENT ISSUES

In her first issue on appeal, appellant contends the evidence was legally insufficient to support her convictions. Appellant argues that, under a hypothetically correct jury charge, she "would necessarily have been charged either for abandoning the animals or unreasonably failing to provide necessary food, water, or care[,]" and that she was instead "charged with killing the animals based upon elements defined as a misdemeanor in the statute." In her second issue on appeal, appellant contends that "the trial court err[ed] by overruling [her] motion to dismiss the indictments where the State alleged a felony by commission of elements defined as a misdemeanor under the animal cruelty statute[.]" Both issues hinge, at least in part, on appellant's argument that failing to feed the animals is a misdemeanor under the animal cruelty statute and that "[t]he State may not allege a misdemeanor cruelty charge under the guise of a felony."

*Jurisdiction*

Because appellant's second issue on appeal challenges the jurisdiction of the trial court, we address it first. Whether a court has subject matter jurisdiction is a question of law. *Coleman v. State*, No. 07–10–00423–CR, 2011 WL 3925767, at *2 (Tex. App.—Amarillo Sept. 7, 2011, no pet.) (mem. op., not designated for publication) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). In Texas, district courts have jurisdiction over felony offenses. TEX. CODE CRIM. PROC. ANN. art. 4.05 (Vernon 2005); *see also* TEX. CONST. art. V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body."); TEX. GOV'T CODE ANN. § 24.007(a) (Vernon Supp. 2014) ("The district court has the jurisdiction provided by Article V, Section 8, of the Texas Constitution."); *Puente v. State*, 71 S.W.3d 340, 343 (Tex. Crim. App. 2002) ("A district court has jurisdiction over felony offenses. It does not have original jurisdiction over misdemeanor charges, except those involving official misconduct.").

Appellant, relying on *State v. Kingsbury*, 129 S.W.3d 202, 206–07 (Tex. App.—Corpus Christi 2004, no pet.), argues that "[a] person can commit the misdemeanor offense of failing unreasonably to provide necessary food, water,

9

care or shelter or a person may commit the felony offense of torturing, killing, or causing serious bodily injury to an animal—but a person cannot commit a felony offense by committing predicate acts that are listed as a misdemeanor under the statute." The State responds that *Kingsbury* is not applicable because it interprets a version of the animal cruelty act that has since been amended. We agree with the State.

In *Kingsbury*, the State indicted Kingsbury for felony animal cruelty. *Id.* at 204. The animal cruelty statute in effect at the time provided that:

(a) A person commits an offense if the person intentionally or knowing:

(1) tortures an animal;

(2) fails unreasonably to provide necessary food, care, or shelter for an animal in the person's custody; . . . or

(5) kills, seriously injures, or administers poison to an animal, other than cattle, horses, sheep, swine, or goats, belonging to another without legal authority or the owner's effective consent . . . .

Acts of 1989, 71st Leg., ch. 1253, § 2, eff. Sept. 1, 1989; Acts of 1993, 73rd Leg., ch. 900, § 1.01, eff. Sept. 1, 1993; Acts of 1995, 74th Leg., ch. 318, § 18, eff. Sept. 1, 1995; Acts of 1997, 75th Leg., ch. 1281, § 2, eff. Sept. 1, 1997; Acts of 2001, 77th Leg., ch. 450, § 1, eff. Sept. 1, 2001; Acts of 2003, 78th Leg., ch. 1275, § 2(11), eff. Sept. 1, 2003; Acts of 2007, 80th Leg., ch. 886, § 1, eff. Sept. 1, 2007 (current version at TEX. PENAL CODE ANN. § 42.092 (Vernon 2011). Under the prior statute, torturing an animal under subsection (a)(1) and killing, seriously

10

injuring, or poisoning another person's animal under subsection (a)(5) were felonies, while failing to provide necessary food, care, or shelter to an animal in one's custody under subsection (a)(2) was a misdemeanor. *Id.* The statute did not define "tortures." *Id.*

The felony indictment against Kingsbury alleged that he intentionally or knowingly tortured four dogs by leaving them without food and water, which led to their deaths. *Kingsbury*, 129 S.W.3d at 204. Kingsbury filed a motion to dismiss, alleging that the indictment alleged felony torture, but used, as the defining element, language from the misdemeanor offense of failing to provide necessary food, care, or shelter. *Id.* The trial court agreed, and dismissed the case for want of jurisdiction because the indictment alleged a misdemeanor under the guise of a felony. *Id.* The court of appeals affirmed, holding that "torture" could not be interpreted to include the misdemeanor criminal acts of failing to provide necessary food, care, or shelter. *Id.* at 206. To permit such an overbroad meaning of "torture" would allow any of the misdemeanor acts of cruelty to be charged as felonies. *Id.* at 207.

However, the animal cruelty statute was amended in 2007, and the current version provides in part as follows:

(b) A person commits an offense if the person intentionally, knowingly, or recklessly:

11

(1) Tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal;

(2) Without the owner's effective consent, kills, administers poison to, or causes serious bodily injury to an animal;

(3) fails unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody;

(4) abandons unreasonably an animal in the person's custody;

(5) transports or confines an animal in a cruel manner;

(6) without the owner's effective consent, causes bodily injury to an animal;

(7) causes one animal to fight with another animal, if either animal is not a dog;

(8) uses a live animal as a lure in dog race training or in dog coursing on a racetrack; or

(9) seriously overworks an animal.

TEX. PENAL CODE ANN. § 42.092(b) (1–9) (Vernon 2011). Failing unreasonably to provide food, water, care, or shelter to an animal in one's custody and abandoning unreasonably an animal in one's custody are Class A misdemeanors unless the defendant has prior convictions for animal cruelty. *See id.* § 42.092(c). Torturing an animal and killing or causing serious bodily injury to an animal in a cruel manner are state jail felonies. *Id.* The statute now defines "torture" as "any act that causes unjustifiable pain or suffering" and "cruel manner" as "a manner that causes or permits unjustified or unwarranted pain or suffering." *See id.* § 42.092(a)(3), (8).

The indictment in this case provided that appellant "did then and there intentionally, knowingly, or recklessly cause serious bodily injury and/or kill, in a cruel manner, an animal, to-wit: [cats # 1, 2, 3, and 7] by failing to provide food and/or water and/or care . . . ." The indictment in this case, unlike the indictment in *Kingsbury*, does not simply allege a misdemeanor cruelty charge "under the guise of a felony." It is true that the State had to prove that appellant failed to provide food, water, or care to the cats, as prohibited by subsection (b)(3) of the animal cruelty statute, but it also had to prove death or serious bodily injury to the cat that was committed in a cruel manner, i.e., by causing unjustified or unwarranted pain or suffering. In other words, the failure to provide food, water, or care is the manner and means by which appellant killed the cats, causing them unjustified pain or suffering. It is the killing in a cruel manner that elevates the simple failure to provide food, water, or care from a misdemeanor to a state jail felony in much the same way that a victim's death elevates an assault to a murder. Unlike *Kingsbury*, the current statute required the state to assume a higher burden than merely proving the elements of the misdemeanor offense of failing to provide food, water, or care in order to prove the felony offense alleged. As such, the charged offense was not merely a misdemeanor cruelty charge "under the guise of a felony."

13

The indictment in this case tracked the language of section 42.092(b)(1), which is a state jail felony. An indictment that tracks the statutory language proscribing certain conduct is sufficient to charge a criminal offense. *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996). Because the criminal offenses charged here were state jail felonies, not simply misdemeanors, the trial court had jurisdiction over the case.

Accordingly, we overrule issue two.

*Sufficiency*

In her first issue on appeal, appellant contends the evidence is legally insufficient. Specifically, appellant challenges whether there is sufficient evidence of the culpable mental state of recklessness. We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams v. State*, 235

14

S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offenses of which she is accused. *Id.*

A person commits the offense of animal cruelty, as pleaded and submitted to the jury in this case, if she recklessly and in a cruel manner kills or causes serious bodily injury to an animal. TEX. PENAL CODE ANN. § 42.092(b)(2). In a "cruel manner" includes a manner that causes or permits unjustified or unwarranted pain or suffering. *Id.* § 42.092(a)(3).

A person's culpable mental state may be inferred from her acts, words, and conduct, and the surrounding circumstances. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see Laster v. State,* 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) ("[O]ne's acts are generally reliable circumstantial evidence of one's intent."). The culpable mental state of "reckless" is satisfied by evidence indicating that the defendant consciously disregarded a substantial and unjustifiable risk that the proscribed harm would occur—a risk that if disregarded constitutes a gross deviation from the

15

standard of care an ordinary person would exercise under the same circumstances. *Davis v. State,* 955 S.W.2d 340, 348–49 (Tex. App.—Fort Worth 1997, pet. ref'd); *see* TEX. PENAL CODE ANN. § 6.03(c) (Vernon 2011) ("A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.") Reckless conduct "involves conscious risk creation, that is, [that] the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk." *Davis*, 955 S.W.2d at 349 (quoting *Aliff v. State,* 627 S.W.2d 166, 171 (Tex. Crim. App. 1982)).

Appellant first argues that "[t]he jury charge and the indictment did not accurately set out the law[,]" and that under a hypothetically correct charge she would have been charged with misdemeanor failure to provide the cats with necessary food, water, or care under section 42.092(b)(3). She further argues that there is insufficient evidence that she failed to provide food or water or that she had custody of the cats as required by the misdemeanor offense. However, we have already held that appellant was properly charged under the felony section 42.092(b)(1), not the misdemeanor section 42.092(b)(3). Thus, her argument that the evidence is legally insufficient to prove the elements of the misdemeanor is irrelevant.

Appellant next argues that "[t]he evidence was insufficient even though the indictments and jury charges were defective[]" because "[t]he mental state of recklessness was not proven." Appellant argues that Kimberly Paskert's testimony proved that appellant "had no knowledge of the conditions at Whiskerville and that she lied to the Appellant about the status of the cats whose care she was responsible for[,]" and that appellant could not have anticipated Paskert's failure to show up for work.

The State responds that its "sole theory at trial was that Appellant was reckless in relying on only one person to care for 200 cats." In other words, the State is contending that appellant's operation of the shelter with only one employee, who had no assistance or back-up, and who had expressed her need for help on more than one occasion, created the risk of the animals' deaths in a cruel manner, which appellant consciously disregarded.

Here, there was evidence that Paskert, the sole employee at Whiskerville, was overwhelmed by her workload. Paskert testified that it took 10 to 15 hours per day to complete all of the tasks assigned to her, which she tried to accomplish at least two to three days per week. On the other days she worked six to eight hours per day; she never worked less than three hours.

From January 2011 until December 26, 2011, Paskert worked seven days per week, even after she asked appellant to hire someone else to work on the two days

17

that Paskert also cleaned houses for other people. Paskert tried her best to keep up with the tasks, but was not able to do so.  Appellant's daughter, who had worked at Whiskerville in the past, described the work as "back breaking."

Appellant knew that Paskert needed help, but would always respond when questioned about it that she "was working on it."  A few months before the cats were seized, Donna Jones, a former Whiskerville employee, came by the shelter to pick up cat food.  Jones found Paskert there, upset and crying.  Paskert told Jones that she was tired, her hands were hurting from all the cleaning, and she needed help.  Appellant was aware that Paskert, who was 48 years old, had suffered from arthritis for many years.

Appellant, who lived approximately 20 minutes away from Whiskerville, rarely went to the sanctuary.  Appellant usually showed up only for adoption days, and Paskert had not seen appellant at the sanctuary since early October 2011. Indeed, a neighbor, Donna Myers, testified that she had seen no one at Whiskerville during the entire month of December 2011.

Kim Schoolcraft, the manager at the Animal Resource Center in Galveston, testified that she had 10 to 12 employees to take care of the 275 animals that she averaged at her facility.  In Schoolcraft's opinion it was "absolutely" unreasonable to expect one person to care for 200 cats.

Although appellant claims that she reasonably relied on Paskert to show up and care for the cats and that Paskert had been a reliable employee for six years before suddenly failing to appear for work, there was evidence that Paskert had quit or was fired once before because she was unable to keep up with the work to appellant's satisfaction.

Based on the evidence that appellant (1) expected Paskert alone to care for 200 cats seven days per week, (2) provided no assistance or back-up for the arthritic Paskert, even though she knew Paskert needed and had requested assistance, (3) rarely went to the shelter herself and had not been seen at Whiskerville in months, and (4) was difficult to reach, other than by text message, and that (5) Paskert had quit or been fired once before when she could not keep up with the work, the jury could have believed beyond a reasonable doubt that appellant created the risk that the animals would not be properly cared for, causing them to be killed or suffer severe bodily injury in a cruel manner, and that appellant consciously disregarded the substantial and unjustifiable risk that the cats' deaths would occur.

Accordingly, we overrule issue one.

*Strict Liability*

In issue three, appellant contends the trial court erred "by overruling the appellant's motion to dismiss the indictments where the state created strict liability

19

offenses." Specifically, appellant argues that "the State alleged the misdemeanor elements of animal cruelty without alleging the defensive elements of custody and reasonableness." Appellant's issue is premised on the assumption that the indictment charged appellant with the misdemeanor offense of failing "*unreasonably* to provide necessary food, water, care, or shelter for an animal in the person's *custody*[]" under section 42.092 (b)(3). However, as we have already held, the indictment charged appellant with committing an offense under section 42.092(b)(1), which does not contain what appellant refers to as "the defensive elements of custody and reasonableness."

Accordingly, we overrule issue three.

### *In Pari Materia*

In issue four, appellant contends the trial court erred "by overruling [her] motion to quash the indictments based upon the doctrine of *in pari materia*[.]" Appellant contends that she should have been charged with the misdemeanor offense of "abandoning" an animal under subsection (b)(4), rather than the state jail felony of killing or causing serious bodily injury to an animal in a cruel manner under subsection (b)(1). Specifically, appellant argues that the abandoning portion of the statute more specifically covers the conduct she is alleged to have committed, thus she should have been charged with that offense.

When two statutes address the same general subject, they are considered as being *in pari materia. See State v. Vasilas,* 253 S.W.3d 268, 271 (Tex. Crim. App. 2008). All acts and parts of acts *in pari materia* must be read and construed together as though they were parts of one and the same law, even if they were enacted at different times. *Id.* Whenever possible, we must harmonize any conflict between the two statutes so that each is given effect. *Id.* at 272. If the statutes are irreconcilable, then we must apply the more "special" statute as an exception to the general one. *See* TEX. GOV'T CODE ANN. § 311.026 (Vernon 2013). In the context of penal provisions, the Court of Criminal Appeals has determined statutes to be *in pari materia* "where one provision has broadly defined an offense, and a second has more narrowly hewn another offense, complete within itself, to proscribe conduct that would otherwise meet every element of, and hence be punishable under, the broader provision." *Jones v. State*, 396 S.W.3d 558, 561 (Tex. Crim. App. 2013) (quoting *Azeez v. State*, 248 S.W.3d 182, 192 (Tex. Crim. App. 2008)).

A list of four non-exclusive factors may be considered in determining whether the statutes are in *pari materia,* namely, whether the statutes: (1) involve different penalties; (2) are contained in the same legislative act; (3) require the same elements of proof; and (4) were intended to achieve the same purpose or objective. *Burke v. State,* 28 S.W.3d 545, 547 (Tex. Crim. App. 2000).

21

Here, the statutes involve different penalties. Subsection (b)(1) is a state jail felony and subsection (b)(4) is a Class A misdemeanor. *See* TEX. PENAL CODE ANN. § 42.092(c). While both subsections were promulgated in the same 2007 legislative act, they do not require the same elements of proof. As we discussed in issue two, the felony offense in subsection (b)(1) requires killing or causing serious bodily injury to the animal in a cruel way, i.e., causing unwarranted pain and suffering. The misdemeanor offense of abandoning does not require death, serious bodily injury, or the causing of unwarranted pain and suffering. And, while both statutes are intended to prevent animal cruelty, the "nature of the forbidden conduct" in the misdemeanor subsection (b)(4) is abandoning an animal, while the forbidden conduct in the state jail felony subsection (b)(1) is killing or causing serious bodily injury in a way that causes unwarranted pain and suffering. *See Mills v, State*, 722 S.W.2d 411, 415 (Tex. Crim. App. 1986) (determining statute's purpose and objective by considering conduct forbidden by statute).

As such, we conclude that abandonment is not a "more narrowly hewn . . . offense, complete within itself, [that] proscribe[s] conduct that . . . otherwise meet[s] every element of, and hence [is] punishable under" subsection (b)(1). *Id.* at 414. Put simply, proof of abandonment alone will not prove the elements of the crime charged.

We overrule appellant's fourth issue.

## DEFENSIVE ISSUES

### *Denial of Defensive Charges*

In her fifth issue on appeal, appellant contends the trial court erred "by failing to give appellant's requested charges on custody, assumption of custody, and reasonableness."

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State,* 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). The defendant is entitled to an instruction on every defensive issue raised by the evidence, "regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief." *Id.* at 209. The Court of Criminal Appeals has held, however, "that if the defensive theory is not explicitly listed in the penal code—if it merely negates an element of the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it." *Id.; see also Giesberg v. State,* 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court

23

concludes [that] a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction.").

Here, the animal cruelty statute contains affirmative defenses to killing or injuring someone else's dog without their consent if (1) the animal is discovered on one's property and is injuring or killing livestock or damaging crops, or (2) the person killed the animal within the scope of the actor's employment as a public servant or in furtherance of certain electrical or natural gas delivery activities. *See* TEX. PENAL CODE ANN. § 42.092(e). Neither statutory defense is applicable here. The statute also provides an exception to its application if the actor is involved in "generally accepted and otherwise lawful" conduct relating to fishing, hunting, or trapping, wildlife management and related activities, or animal husbandry or agriculture practices involving livestock. *See Id.* § 42.092(f). The jury was charged on these provisions. No other defenses are listed in the statute.

At the jury charge conference, appellant requested, and was denied, the following charges relating to her defensive issue of "assumption of custody":

> "Custody" includes responsibility for the health, safety, and welfare of an animal subject to the person's care and control, regardless of ownership of the animal.

> A person may transfer custody by making reasonable arrangements for the assumption of custody by another person.

24

The first paragraph of the requested charge is taken from the definitions in the animal cruelty statute. *See id.* § 42.092(a)(4). The second paragraph is included in the definition of "abandon." *See id*. § 42.092(a)(1).

The misdemeanor subsection (b)(3) provides that a person commits an offense by failing "unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody." Custody, as defined in the statute, is an element of the misdemeanor subsection (b)(3), and, as such, even if appellant were charged under subsection (b)(3), which she was not, the second paragraph of the requested charge would be an improper comment on the weight of the evidence. *See Giesberg*, 984 S.W.2d at 248.

Because appellant was not charged under subsection (b)(3), but under subsection (b)(1), which does not mention custody, the statutory definition of custody in the first paragraph of the requested charge was not required. "The better charging practice is to limit the definitional paragraphs [as was done here] to the portions of the statute applicable to the allegations in the indictment." *Lewis v. State*, 676 S.W.2d 136, 143 (Tex. Crim. App. 1984).

Appellant's strategy at trial was to assert that Kimberly Paskert, not she, killed the animals. This attempt at shifting culpability to a third party is essentially an alibi defense. *See McGregor v. State*, 394 S.W.3d 90, 123–24 (Tex. App.— Houston [1st Dist.] 2012, pet. ref'd) (by requesting third-party-culpability issues

25

defendant "is essentially raising the defense of alibi"). Charges on defensive issues raising alibi are not proper because they are an improper comment on the weight of the evidence. *Giesberg*, 984 S.W.2d at 248–50; *McGregor*, 394 S.W.3d at 124. As such, the trial court properly denied appellant's requested defensive issues relating to custody.

We overrule issue five.

### *Due Process*

In her sixth issue on appeal, appellant contends that she was "deprived of due process and due course of law by the State's conduct in this case." The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law[.]" *See* U.S. CONST. amend. XIV, § 1. Similarly, the Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities . . . except by the due course of the law of the land." TEX. CONST. art. I, § 19. "The touchstone of due process is fundamental fairness." *Euler v. State*, 218 S.W.3d 88, 91 (Tex. Crim. App. 2007).

Appellant argues that the State's conduct in the case was fundamentally unfair because "[t]he State cobbled together an indictment that charged a felony based upon misdemeanor conduct, and then attempted to add the misdemeanor

26

back when they requested the lesser charge so as to prevent the jury from considering the defenses claimed in the misdemeanor statute."

Again, appellant's issue is based on the assumption that the case was wrongly charged as a felony and that her defensive issues were erroneously excluded. We have already held to the contrary on both issues. Further, we note that even if the State's attempts to include lesser-included offenses at the last minute were somehow unfair, the trial court, at appellant's request, did not include any lesser-included offenses in the jury charge.

Accordingly, we overrule issue six.

## SEQUESTRATION ISSUES

Due to the publicity in Galveston surrounding this case, appellant moved to sequester the jury pursuant to TEX. CODE CRIM. PROC. ANN. art. 35.23 (Vernon 2006). The trial court granted the motion. Accordingly, the bailiff accompanied the jury to a local hotel room at approximately 11 p.m. on December 19, 2012. Approximately four hours later, around 2 a.m., a bomb threat was phoned in to the hotel, and the hotel was evacuated. The bailiffs took the jurors outside to their van. While leaving the hotel, the jurors overheard other people at the hotel discussing the bomb threat; no one spoke to the jurors directly.

The bailiffs took the jurors to another hotel, but did not check them in because the hotel was unable to accommodate all of the jurors on the same floor.

27

Some of the jurors told the bailiffs that they would feel safer at the courthouse, so the bailiffs returned the jury to the courthouse at 3:15 a.m. The jury was kept together in the deliberation room, where they were permitted to sleep on the floor. At 7:30 a.m., the bailiffs took the jurors back to their original hotel to collect their belongings and then took them to breakfast. The jurors then returned to the courthouse to resume their deliberations.

After one of the bailiffs testified to these events, appellant moved for a mistrial, which the State did not oppose. The trial court denied the motion, the jury resumed its deliberations, and appellant was ultimately convicted.

*Denial of Mistrial and Motion for New Trial*

In her seventh issue on appeal, appellant contends the trial court "erred by failing to grant an agreed mistrial after previously sequestered jurors were not provided overnight facilities and were allowed to separate in violation of TEX. CODE CRIM. PROC. ANN. art. 35.23."[1] In her eighth issue on appeal, appellant

---

[1] TEX. CODE CRIM. PROC. ANN. art. 35.23 provides as follows:

The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury. ***The court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged***. Any person who makes known to the jury which party made the motion not to allow separation of the jury shall be punished for contempt of court. ***If such jurors are kept overnight, facilities shall***

contends the trial court erred in denying her motion for new trial urging the same grounds. In both motions, appellant argued that the jury was allowed to separate during the hotel evacuation and that "[i]t was during this separation that the jurors learned that a bomb threat had been made against their hotel room—and by extension to themselves." Appellant also argued that the jury deliberation room, in which the jury finally slept, "fails to qualify as 'separate facilities' under Article 35.23."

A mistrial is appropriate only in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004); *Juarez v. State*, 409 S.W.3d 156, 166 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Whether a mistrial is required depends on the particular facts of the case. *Ocon*, 284 S.W.3d at 884.

Similarly, we review a trial court's rulings on a motion for new trial for an abuse of discretion. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). In conducting our review, we may not substitute our judgment for that of

*be provided for female jurors separate and apart from the facilities provided for male jurors.* In misdemeanor cases the court may, at its discretion, permit the jurors to separate at any time before the verdict. In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated. (Emphasis added).

the trial court. *Id*. Rather, we decide only whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

The State contends that, even if we assume a violation of section 35.23 occurred, the error is harmless. We agree. Error, if any, in failing to properly sequester the jury is a statutory violation, not a constitutional violation. *Campbell v. State*, 189 S.W.3d 822, 826 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Rojas v. State*, 986 S.W.2d 241, 252 (Tex. Crim. App. 1998) (Keller, J., concurring). As such, any non-constitutional error that does not affect appellant's substantial rights must be disregarded. *Id.*; TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect on its verdict. *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

Appellant argues that the "harm is obvious" because "[t]he jurors would undoubtedly have (wrongly) attributed the bomb threat to the Appellant" and "rendered their verdict in an environment of hostility, fear, and exhaustion[,]"

30

which "undoubtedly led the jury to reaching a verdict of guilt that would not have been rendered under normal circumstances."

Nothing in the record, however, supports appellant's assertions. The record shows that the jury was kept together at all times during the evacuation. And, while they were generally aware of a bomb threat at the hotel from overhearing others in the area, no information was given to the jury directly by third parties, and nothing supports the conclusion that the jury attributed the bomb threat to appellant. Indeed, the bailiff, Sergeant Elizondo, who was with the jury on the night in question, testified that the jurors were doing "surprisingly" well and were not in "any particular distress" over the bomb threat. He added that he had not noticed any desire by the jury to discontinue their deliberations. As such, we conclude that appellant's substantial rights were not affected by returning the jury to the deliberation room a few hours early in light of the situation presented at their hotel.

We overrule issues seven and eight.

## CONCLUSION

We affirm the trial court's judgments.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish.   Tex. R. App. P. 47.2(b).